IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and HOWARD McDOUGALL, Trustee, | ) ) ) ) | Case No. 07 C 5880 |
| Plaintiffs, | ) ) | Judge Virginia M. Kendall |
| v. | ) ) | |
| SARA LEE BAKERY GROUP, INC., a Delaware corporation (f/k/a The Earthgrains Company), as Successor in Interest to Metz Baking Company, | ) ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Central States, Southeast and Southwest Areas Pension Fund and Howard McDougall, Trustee, (collectively "Central States" or "the Fund") filed suit against Sara Lee Bakery Group, Inc. ("Sara Lee") pursuant to Section 515 of the Employee Retirement Income Security Act, 29 U.S.C. § 1145 ("ERISA") to collect allegedly delinquent pension contributions. Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Sara Lee and Central States have filed cross-motions for summary judgment on Central States' Complaint. For the reasons stated herein, Sara Lee's Motion for Summary Judgement is denied and Central States' Motion for Summary Judgment is granted.

<u>**STATEMENT OF UNDISPUTED FACTS**</u>[1]

**I.      The Parties**

Central States is a multiemployer pension plan that pays pension benefits to its participants and their beneficiaries.  (CS 56.1 Resp. ¶ 1; 29 U.S.C. §§ 1002(2), 37 (A).)  Howard McDougall is a Trustee and fiduciary of the Fund.  (SL 56.1 Resp. ¶ 4.)  The Fund is funded in part by contributions remitted by multiple participating employers pursuant to negotiated collective bargaining agreements with local unions affiliated with the International Brotherhood of Teamsters. (CS 56.1 Resp. ¶ 2.)  Employer contributions are held and used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the Fund and for administrative expenses.  (SL 56.1 Resp. ¶ 3.)

Sara Lee Bakery Group Inc. is a participating and contributing employer under the Fund. (CS 56.1 Resp. ¶ 11.)  Sara Lee Bakery Group Inc. is the parent company to The Earthgrains Co. ("Earthgrains") and Metz Holdings Inc. ("Metz").  (SL 56.1 Resp. ¶ 6.)  By way of brief background, Metz Baking Co. is a manufacturer, marketer, distributor and wholesaler of fresh bread and baked goods and is a wholly-owned subsidiary of Metz.  (CS 56.1 Resp. ¶ 4.)  In November 1999, Metz became a wholly owned subsidiary of Earthgrains.  (CS 56.1 Resp. ¶ 4.) During August 2002, Sara Lee Corporation acquired Earthgrains and as a result of the merger, Earthgrains merged into and became The Earthgrains Baking Companies, Inc. which became the direct successor to

---

[1]Throughout this Opinion, the Court references the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Central States' Response to Sara Lee's Statement of Facts have been abbreviated to "CS 56.1 Resp. ¶ __." ; citations to Sara Lee's Reply to Central States' Statement of Additional Material Facts have been abbreviated to "SL 56.1 Reply ¶ __."; citations to Sara Lee's Response to Central States' Statement of Facts have been abbreviated to "SL 56.1 Resp. ¶ __."; and citations to Central States' Reply to Sara Lee's Statement of Additional Material Facts have been abbreviated to "CS 56.1 Reply ¶ __."

Earthgrains.  (CS 56.1 Resp. ¶ 5.)  Following Sara Lee Corporation's acquisition of Earthgrains and the creation of The Earthgrains Baking Companies, Inc., Sara Lee Corporation created Sara Lee Bakery Group, Inc. ("Sara Lee") as its wholly-owned subsidiary.  (CS 56.1 Resp. ¶ 6.)  Earthgrains Baking Companies, Inc. then became a wholly owned subsidiary of Sara Lee, and as such, Metz Holdings, Inc. and its subsidiary Metz Baking Company became second and third tier subsidiaries. (CS 56.1 Resp. ¶ 6; SL 56.1 Resp. ¶ 6.)

## II.     The Metz's Distribution Depot and the Local 955 CBA

Until February 14, 2001, Metz and Earthgrains owned and operated separate bread distribution depots in Topeka, Kansas.  (CS Resp. ¶¶ 7, 8, 13, 21.)  Route Sales Representatives ("RSRs") at Metz were represented by Teamsters Local 955 ("Local 955"), a labor union and local affiliate of the International Brotherhood of Teamsters.  (CS 56.1 Resp. ¶¶ 15, 16, 17; SL 56.1 Resp. ¶ 7.)  Metz's RSRs were covered by a collective bargaining agreement ("CBA") with  Local 955, whose term commenced on March 22, 1998 and continued through March 23, 2002, and "remain[ed] in full force and effect from year to year thereafter unless either party . . . give[s] notice in writing sixty (60) days prior to March 23, 2002, or any subsequent anniversary date, to the other party of intention to amend, change, or termination [sic] this Agreement."  (CS 56.1 Resp. ¶ 14; SL 56.1 Resp. ¶¶ 15, 20; Def. Ex. A, Art. XXX, § A.)

Pursuant to the CBA, Metz was required to make pension contributions to the Fund on behalf of Local 955 employees that have been on its payroll for thirty days or more.  (CS 56.1 Resp. ¶ 19; SL 56.1 Resp. ¶ 16; Def. Ex. A, Art. XXIII, § A.)  Specifically, the CBA provides that Metz was required to contribute to the Fund "for each week on each regular or extra employee, even though such employee may work only part time . . . , including weeks where work is performed for [Metz]

but not under the provisions of this contract . . . ." (CS 56.1 Resp. ¶ 19; SL 56.1 Resp. ¶ 19; Def. Ex. A, Art. XXIII, § F.) The CBA also mandates that Metz continue to make the required contributions for a period of four weeks if an employee is absent because of illness or off-the-job injury and notifies Metz of such absence, and that Metz continue to make the required contributions until the employee returns to work if the employee is injured on the job; however, such contributions shall not exceed six months. (Def. Ex. A, Art. XXIII, § D.) Under the terms of the CBA, Metz was required to continue to contribute to the Fund at a rate of $65.00 per week for each covered employee, for at least one year after the expiration of the Agreement, provided Metz is still doing business in Kansas City and there is an extension to the contract. (SL 56.1 Resp. ¶ 17; Def. Ex. A, Art. XXIII, § A(1).) Prior to February 2001, Metz was making contributions to the Fund on behalf of six of its employees: Nick Burnet, Elmer Burnett, Russell Griffin, Jason Porter, Rich Roberts, and Larry Starkebaum (the "Local 955 employees"). (CS 56.1 Resp. ¶ 20, 32; SL 56.1 Resp. ¶¶ 27, 28.) The Fund was accepting these contributions and awarding Pension Credit to these six employees because the Fund had approved of and accepted the Local 955 CBA. (SL 56.1 Reply ¶ 37.)

Pursuant to the Local 955 CBA, Metz entered into a pre-existing "Trust Agreement" with the Fund for the purpose of administering the fund. (SL 56.1 Resp. ¶ 18; Def. Ex. A, Art. XXIII, § C.) The Trust Agreement provides:

> [Metz] shall remit continuing and prompt contributions to the Trust Fund as required by the applicable collective bargaining agreement to which [Metz] is a party, applicable law and all rules and requirements for participation by Employers in the Fund as established and interpreted by the Trustees in accordance with their authority . . . . Any agreement or understanding between the parties that in any way alters or affects [Metz's] contribution obligation as set forth in the collective bargaining agreement shall be submitted promptly to the Fund [by certified mail to the Contracts Department]; any such agreement or understanding between the parties that has not

4

been disclosed to the Fund as required by this paragraph shall not be binding on the Trustees and shall not affect the terms of the collective bargaining agreement which alone shall be enforceable. The obligation to make such contributions shall continue during periods when the collective bargaining agreement is being negotiated, but such contributions shall not be required in case of strike after contract termination, unless the parties mutually agree otherwise.

(SL 56.1 Resp. ¶ 22; Pl. Ex. A, Trust Agreement, Art. III, § 1.)

### III.    The Earthgrains Distribution Depot and the Local 795 CBA

RSRs at Earthgrains' bread depot are represented by Teamsters Local 795 ("Local 795"), a labor union, and are covered by a Local 795 CBA. (CS 56.1 Resp. ¶ 22; SL 56.1 Resp. ¶ 8.) Under the Local 795 CBA, Earthgrains was required to submit pension contributions on behalf of its covered employees to the American Bakers Association Pension Fund. (CS 56.1 Resp. ¶ 23.)

### IV.    The Consolidation of Metz and Earthgrains

In late 2000, Earthgrains began contemplating consolidating its bread depot with Metz's. (CS 56.1 Resp. ¶ 24.) Economically, merging the two depots made a great deal of sense, including providing for more efficient operational distribution. (CS 56.1 Resp. ¶ 24.) In February 2001, representatives from Earthgrains and Metz met with Local 955's business agent, James Shoaf ("Shoaf") to discuss the possibility of closing the Metz depot and relocating the Local 955 drivers to Earthgrains' depot. (CS 56.1 Resp. ¶¶ 25, 26.) To effectuate the consolidation and relocation of the drivers, Earthgrains and Metz told Shoaf they wanted to fire all of the Local 955 Metz employees and rehire them at the Earthgrains' depot under a new CBA–the Local 795 CBA. (CS 56.1 Resp. ¶ 22.) On February 13, 2001, despite Shoaf's protestation, Earthgrains and Metz closed the Metz depot. (CS 56.1 Resp. ¶ 29.) The next day, Metz fired all of its employees, including the six Local

955 employees, and Earthgrains rehired them to perform work under the Local 795 CBA.  (CS 56.1 Resp. ¶¶ 30, 32; SL 56.1 Resp. ¶¶ 29, 30.)  At no time prior to, or after February 14, 2001, did either Metz or Local 955 serve each other with a written termination notice of their CBA.  (CS 56.1 Resp. ¶ 31; SL 56.1 Resp. ¶ 31.)

After February 21, 2001, the six former Metz Local 955 employees did not perform any work out of the Metz distribution depot.  (CS 56.1 Resp. ¶ 31; SL 56.1 Resp. ¶ 31.)   After a short transition period from February 21 through April 21, 2001, where Metz was still paying its former Local 955 employees, Earthgrains put them on its payroll.   (CS 56.1 Resp. ¶ 33.)   Beginning in June 2001, Earthgrains paid union dues on behalf of the former Metz Local 955 employees to Local 795, rather than Local 955.  (CS 56.1 Resp. ¶ 36; SL 56.1 Resp. ¶ 34.)

## V.     Local 955's Grievance

As a result of Metz's actions in merging with Earthgrains and firing its Local 955 union members, Local 955 filed a grievance against Earthgrains D/B/A Metz ("the Company") alleging that it had improperly repudiated the Local 955 CBA and improperly discharged the six former Metz RSRs in violation of the CBA.  (CS 56.1 Resp. ¶ 37; SL 56.1 Resp. ¶¶ 32, 33.)  The matter proceeded to arbitration on January 9, 2002.  (CS 56.1 Resp. ¶ 38.)  On April 17, 2002, the Arbitrator sustained Local 955's grievance finding that the successor clause in the parties' CBA speaks to the original intent of the parties and bars the Company from opting out of the contract when it decides to change its corporate structure.  (SL 56.1 Resp. ¶ 36; Def. Ex. B, at 5.)  The Arbitrator ordered that "[the Company] is to return to the labor agreement it agreed to with Local 955.  The goal is status quo ante bellum.  The Union and employees are to be made whole.  This includes, but is not limited to, wages, benefits and retirement."  (CS 56.1 Resp. ¶ 39; SL 56.1 Resp.

¶¶ 35, 37; Def. Ex. B, at 6.)  Pursuant to the Arbitrator's Award, Earthgrains and Local 955 had to "live with [the Local 955 CBA] unless changed by mutual agreement."  (SL 56.1 Resp. ¶ 36; Def. Ex. B, at 5.)

Following the Arbitrator's decision, Sara Lee never filed an action to vacate, reverse or challenge the Award.  (SL 56.1 Resp. ¶ 38.)  Notwithstanding the Arbitrator's Award, Metz never reopened its bread depot, the former Metz RSRs never worked for Metz again and the former Metz Local 955 bargaining unit was never repopulated.  (CS 56.1 Resp. ¶ 40.)

## VI.    Implementing the Award

Nine months later, on January 17, 2003, representatives from Sara Lee, Local 955 and Local 795 met to implement the arbitrator's "make whole" remedy.  (CS 56.1 Resp. ¶ 42; SL 56.1 Resp. ¶ 39.)  During this meeting, the parties reached an agreement whereby Sara Lee agreed to make a lump sum monetary payment to the former Metz RSRs.  (CS 56.1 Resp. ¶ 44.)[2]  Sara Lee and Local 955 agreed that the monetary payment would satisfy the Arbitrator's Award in full.  (CS 56.1 Resp. ¶ 45; SL 56.1 Resp. ¶ 46.)  At no time during the meeting did Local 955's representative, Jim Shoaf ("Shoaf"), ever state that the former Metz RSRs, now covered by a Local 795 agreement, should return to a Local 955 contract.  (CS 56.1 Resp. ¶ 46.)[3]

On December 11, 2003, after preparing settlement and release agreements, pursuant to the

---

[2]  In ¶¶ 40-44, 49, 50 of its Rule 56.1 Statement of Facts, Central States submits various facts that rely on statements and documents used during Sara Lee's compromise negotiations with Local 955.  Because these facts rely upon settlement discussions and because they are being offered to establish liability and/or calculate damages, they are inadmissible under Fed. R. Evid. 408.  *See* Fed. R. Evid. 408; *see also Zurich American Insurance Co. v. Watts Industries, Inc.*, 417 F.3d 682, 688-89 (7th Cir. 2005) (Rule 408 forbids admission of evidence when it is offered to prove liability for the claim or its amount).

[3]  The Fund attempts to dispute this fact by making a general denial and citing to the Arbitrator's Award and portions of Sara Lee's Zone Vice President, Jeff Pope's, deposition; however, nothing in the cited material contradicts this fact.  Therefore, the Court deems this fact admitted.  *See* Fed. R. Civ. P. 56(b)(3)(C).

7

terms discussed in the January 17, 2003, meeting, Jeff Pope ("Pope"), Sara Lee's Zone Vice President, executed the agreements on behalf of Sara Lee. (CS 56.1 Resp. ¶¶ 43, 51; SL 56.1 Resp. ¶¶ 45, 47.) The next day, Pope went to see Local 795's representative, Jesse Castillo ("Castillo"), to give him a copy of the settlement agreements before bringing them to Metz's former RSRs for execution. (CS 56.1 Resp. ¶ 49.)[4] Local 955, however, did not see or sign the settlement agreements prior to execution. (SL 56.1 Reply ¶ 31.) On December 13, 2003, all of the former Metz RSRs signed the settlement and release agreements, and thereafter Sara Lee paid them the settlement sums. (CS 56.1 Resp. ¶ 50; SL 56.1 Resp. ¶¶ 48, 49.) Sara Lee paid the monetary settlement directly to the six former Metz employees and did not pay any additional pension contributions to the Fund on their behalf. (SL 56.1 Resp. ¶ 51.) The Fund, however, provided pension credit to the former Metz employees from February 14, 2001 through January 28, 2003. (SL 56.1 Reply ¶ 33.) The Fund was unaware of the arbitration proceedings and the Arbitrator's Award until it received a copy of the Award in November 2005, and it did not learn of the settlement until 2007. (SL 56.1 Reply ¶¶ 20, 38.)

Now, the Fund contends that it is entitled to contributions on behalf of the six former Local 955 employees for the period from February 14, 2001, the date of their termination, through the earlier of two dates: the date each employee ended his employment with Earthgrains or the date that Sara Lee and Local 955 agreed, by mutual consent, to terminate Local 955's representation rights.

---

[4] The Fund disputes that fact that Pope reviewed the settlement agreements with Local 795 by citing to portions of Pope's deposition where he states that he does not remember why he went to Castillo's office on December 12, 2003. *See* Pl. 56.1 Resp. ¶ 49. A closer review of Pope's deposition, however, reveals that when specifically asked if he went to Castillo's office to discuss the settlement agreements, Pope stated that he did:

Q:      Do you recall at least if it was to discuss this issue, the issue of grievance settlements?
A:      What I think it was was probably for me to give him a copy of them before we gave them to the employees . . . .

(Pope Dep. at 86: 2-6.)

(SL 56.1 Resp. ¶ 52.)

## STANDARD OF REVIEW

On cross-motions for summary judgment, each movant must satisfy Federal Rule of Civil Procedure 56's requirements. *See Cont'l Cos. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

<u>**DISCUSSION**</u>

**I.      Motion to Strike**

As an initial matter, Central States moves to strike portions of Sara Lee's Rule 56.1 submissions for non-compliance with L.R. 56.1.  Specifically, Central States moves to strike Sara Lee's Reply to its Response to Sara Lee's Rule 56.1 Statement of Material Facts in its entirety, and all non-complying portions of Sara Lee's Response to Plaintiffs' Rule 56.1 Statement of Additional Facts and Sara Lee's Response to Plaintiffs' Rule 56.1 Statement of Material Facts.  In support of its motion, Central States asserts that L.R. 56.1 does not contemplate a "reply" statement of facts and that Sara Lee's responses are neither "concise" nor "short," contain inappropriate legal argument and fail to directly admit or deny the statements of fact, instead requesting that they be "stricken." (*See* R. 64-3, Pl. Mot. Strike.)

Local Rule 56.1 allows a party opposing summary judgment to file a concise response to the movant's Statement of Facts including: 1) a response to each of the movant's statements of fact including, in the case of disagreement, specific references to materials relied upon; and 2) no more than forty statements of additional facts.  *See* L.R. 56.1(b)(3)(B) & (C).  If the party opposing summary judgment submits additional facts, the moving party may submit a concise response to those facts.  *See* L.R. 56.1(a).  Nonconformity with the Local Rules and the standing orders of the Court is not without consequence.  *See Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 WL 1102272, at *8 (N.D. Ill. Apr. 29, 2004) (St. Eve, J.) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1).  The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of*

*Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.").  "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

Here, Sara Lee's Reply to Central States' Local Rule 56.1(b)(3)(B) Response fails to comply with L.R. 56.1.  Sara Lee did not seek leave of court to file this extra document and it is not contemplated by L.R. 56.1.  Accordingly, this Court has disregarded Sara Lee's reply in its entirety. Nevertheless, the Court notes that Sara Lee's reply does not add any additional facts, but merely attempts to direct the Court to the deficiencies it alleges are contained within Central States' Rule 56.1 submissions.

As for Central States' motion to strike portions of Sara Lee's Response to its L.R. 56.1(a)(1)(3) Statement of Facts and L.R. 56.1(b)(3)(C) Statement of Additional Facts, the Court has not considered portions of *either* parties' Rule 56.1 submissions that do not conform to L.R. 56.1.  Specifically, the Court has not considered facts that do not contain proper support from the parties' citations to the record or contain inappropriate legal argument, irrelevant information or conjecture. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (rule 56.1 statements that contain "irrelevant information, legal arguments, and conjecture" do not comply with the Local Rules).

## II.    Delinquent Pension Contributions under Section 515 of ERISA, 29 U.S.C. § 1145

### A.    Liability

The Fund brings this action, pursuant to Section 515 of ERISA, 29 U.S.C. 1145, to recover delinquent pension contributions from Sara Lee. Specifically, the Fund seeks to enforce the Arbitrator's Award, which it claims mandates that Sara Lee pay delinquent contributions, and it contends that independent of the Arbitrator's Award, unpaid contributions are due under the CBA and Trust Agreement.

### i.    Enforcement of the Arbitrator's Award

Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Pension funds occupy the position of a third party beneficiary of the collective bargaining agreement. *See Robbins v. Lynch*, 836 F.2d 330, 333 (7th Cir. 1988). The Fund, as a third-party beneficiary to the Local 955 CBA, has an independent statutory right under § 515 of ERISA to enforce contribution obligations imposed on Sara Lee under the CBA. *See Central States, S.E. & S.W. Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1152-56 (7th Cir. 1989) (en banc). Section 515 applies to suits brought by funds to collect contributions owed pursuant to arbitration awards. *See Sullivan v. Gilchrist*, 87 F.3d 867, 871 (7th Cir. 1996) (union and pension fund brought action to enforce arbitration award finding employers liable for unpaid pension contributions); *Plumbers Pension Fund Local 130, U.A. v. G.R. Stob Plumbing Inc.*, 1990 WL 37168, at *1 (N.D. Ill. 1990) (Holderman, J.) (beneficiaries of an arbitration award have standing to sue for enforcement of the award).

Here, Local 955 filed a grievance against Earthgrains D/B/A Metz (collectively, "the

Company") for terminating its Local 955 employees in violation of their CBA. On April 17, 2002, the arbitrator sustained the grievance finding that the Company violated the Local 955 CBA by shifting the former Metz Local 955 employees to Earthgrains under a different CBA–the Local 795 CBA. The Arbitrator ordered that the Company "return to the labor agreement it agreed to with Local 955. . ." and ordered that "[t]he [Local 955] Union and employees are to be *made whole*." Def. Ex. B, at 6. The Arbitrator specifically stated that the "made whole" provision "includes, but is not limited to, wages, benefits and retirement." *Id.* Therefore, based upon the Arbitrator's Award, Sara Lee is required to not only pay back wages on behalf of the six employees unlawfully transferred to Earthgrains to perform work under the Local 795 CBA, but is also required to provide the Fund with pension contributions for these six employees. Nine months after the Arbitrator's Award issued, Sara Lee and the Union met to implement the Arbitrator's "make whole" provision and Sara Lee ultimately executed a settlement agreement with the six individual Local 955 employees.

The Court's review of an arbitrator's award is extremely limited and is evaluated under a deferential standard of review because arbitration is intended to be the final resolution of disputes. *See Monee Nursery & Landscaping Co., v. Int'l Union of Operating Eng'rs, Local 150*, 348 F.3d 671, 675 (7th Cir. 2003). When reviewing an arbitrator's decision, the issue is whether the arbitrator interpreted the contract at all, not whether he erred, or even grossly erred, in interpreting the contract. *See Bhd. of Locomotive Eng'rs v. Union Pac. R.R. Co.*, 522 F.3d 746, 757 (7th Cir. 2008) (quotations and citations omitted). The Court may overturn an award only if the arbitrator *was not* interpreting the agreement, but instead resolved the dispute according to private notions of justice. *Id.* (quotations and citations omitted). The relevant inquiry is whether the arbitrator's award "draws

13

its essence from the collective bargaining agreement;" if it does, then the Court must enforce the award. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

A failure to challenge an arbitration award within the applicable limitations period renders the award final. *See International Union of Operating Engineers, Local 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1311 (7th Cir. 1987). Therefore, a defendant in a subsequent enforcement action cannot defend the suit by seeking to nullify the arbitration award, the only avenue for such relief is a timely suit to vacate. *See id*. For example, in *Plumbers Pension Fund, Local 130 v. Domas Mechanical Contractors, Inc.*, 778 F.2d 1266 (7th Cir. 1985), the employer's defense to an enforcement suit also involved an attack on the validity of the arbitration award. The court held that "a defendant's failure to move to vacate [an] arbitration award within the prescribed time period for such a motion precludes it from seeking affirmative relief in a subsequent action to enforce the award." *Id*. at 1268 (quoting *Chauffeurs, Teamsters, Warehousemen and Helpers, Local Union NO. 135 v. Jefferson Trucking Co.*, 628 F.2d 1023, 1025 (7th Cir. 1980)). In Illinois, the appropriate time period for challenging an arbitration award is the 90-day limitations period prescribed by the Illinois Arbitration Act, 710 ILCS 5/12(b). *See Sullivan v. Lemoncello*, 36 F.3d 676, 681 (7th Cir. 1994).

Here, it is undisputed that Sara Lee was well aware of the Arbitrator's decision, and that it did nothing within the subsequent 90-day period to vacate the award. In fact, the record reveals, and Sara Lee concedes that it *never* moved to vacate the Arbitrators Award. Therefore, to the extent that Sara Lee attempts to challenge the merits of the arbitration award as a defense to the Fund's enforcement action, it is bound by the 90-day limitations period and is barred from doing so. *See*

*e.g., Centor*, 831 F.2d at 1311; *Domas*, 778 F.2d at 1268.

### a. Effect of Settlement Agreements with Local 955 Employees

As an initial matter, while conceding that its post-arbitration award settlement agreements with the six former Metz employees does not impair the Fund's claims to collect delinquent pension contributions if a pre-existing obligation exists, Sara Lee also asserts that its settlement with the six Local 955 former Metz employees precludes the Fund from seeking delinquent contributions because the settlements were not undisclosed "side agreements" but rather binding settlements of a jurisdictional dispute that was contemplated by the CBA.

Section 515 bars defenses based on undisclosed side agreements between the employer and the union. *See Central States, S.E. & S.W. Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1257-58 (7th Cir. 1994) (oral understanding); *Central States, S.E. & S.W. Areas Pension Fund v. Transport, Inc.*, 183 F.3d 623, 628 (7th Cir. 1999) (written agreement). Simply put, benefit plans must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations. *See Gerber Truck*, 870 F.2d at 1151. For this reason, Congress placed employee benefit plans in a position analogous to a holder in due course and have restricted the availability of contract defenses in pension fund collection actions. *See id.*

Here, the Fund was not a party to nor did it participate in the settlement agreements. Therefore, to the extent that Sara Lee is attempting to assert that its settlements with the six Local 955 employees bars the Fund's ability to sue for delinquent pension contributions, it is mistaken.

In support of its contention that the settlements bar the Fund from seeking contributions because they were not undisclosed "side agreements" but rather binding settlements reached

pursuant to the arbitration provisions disclosed in the CBA, Sara Lee relies on a district court case from the Central District of Illinois, *Operative Plasterers' & Cement Masons' Local # 18 Annuity Fund v. J.P. Phillips, Inc.*, 573 F. Supp. 2d 1059 (C.D. Ill. Aug. 27, 2008). In *J.P. Phillips,* three distinct and conflicting arbitration awards were entered between the union and the employer. *See id.* at 1062. When faced with conflicting awards, the parties' labor agreement mandates that the national arbitration award control. Therefore, the parties entered into a consent decree, conferred by the D.C. District Court, affirming the validity of the national award. *See id.* Subsequently, the union's pension funds filed suit in the district court seeking to recover pension contributions based in large part on one of the arbitration decisions that was not agreed to in the consent decree. *See id.* The court held that a pension fund cannot ignore *an adverse* arbitration award entered under the auspices of a CBA; rather, once a union has lost a jurisdictional dispute, the union benefit fund cannot then turn around and seek the payment of a benefit fund contribution. *See id.* at 1064. In reaching its holding, the court emphasized that although § 515 bars defenses based on undisclosed side agreements between the employer and the union, the pension fund cannot enforce the contribution provision of the CBA while ignoring provisions of the CBA that make an unfavorable arbitration award binding. *See id.*

Here, unlike the situation in *J.P. Phillips*, the Fund is not attempting to ignore an adverse arbitration award or a settlement entered into under the auspices of the Local 955 CBA. Rather, the Fund is attempting to enforce a favorable award and unlike the consent decree in *J.P Phillips*, the settlement entered into by Sara Lee and the individual Local 955 employees was not contemplated by the CBA. Therefore, the Settlement Agreements entered into by Sara Lee and the individual employees were "undisclosed side agreements," not binding settlements of a jurisdictional dispute,

that cannot be used to bar the Fund from suing Sara Lee for delinquent pension contributions.

Additionally, the decision in *J.P. Phillips* is against the weight of authority which establishes that when a pension fund is not a party to an arbitration it is not bound by the decision of the arbitrator and § 515 precludes employer defenses based upon such awards. *See e.g., Central States, S.E. & S.W. Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 575 (1985) (trustees need not rely on a union to monitor employers' compliance with their trust obligations); *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376 (1984) (pension fund as third party beneficiary to collective bargaining agreement is not bound by arbitration provision); *see also Central States Pension Fund v. Kroger Co.*, 1998 WL 128715, at *5 n. 3 (N.D. Ill. 1998) (citing *American Fed. of Tele. and Radio Artists Health and Retirement Funds v. WCCO Television, Inc.*, 934 F.2d 987, 988-89 (8th Cir. 1991)). Therefore, even if the Arbitrator's Award had been rendered in Sara Lee's favor, the Fund would not have been precluded from bringing suit under § 515 to collect unpaid pension contributions.

Next, Sara Lee attempts to use the settlement agreements to sidestep its obligation by asserting that its settlement of the Arbitrator's Award with the individual Local 955 employees extinguished the Award and therefore the Fund cannot rely on it to create a contribution obligation. While a union may settle a dispute after it has gone to arbitration, union employees may not settle a dispute on behalf of the union. *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994). This is because when employees are represented by a union they are not parties to the collective bargaining unit or any union-company arbitration. *See id.* (holding individual union employees did not have standing to enforce arbitration award).

Here, it was Local 955 that filed the grievance and it is undisputed that Local 955 never saw

or signed the settlement agreements. The Settlement Agreements were only executed by the six individual Local 955 employees and Sara Lee. The union employees did not have the authority to settle the dispute on behalf of Local 955 and therefore any settlement between Sara Lee and the individual employees does not detract from the Fund's ability to rely on the Arbitrator's Award.

In support of its broad contention that "[a]n arbitration award which is resolved via settlement can no longer be relied upon and is disposed of by reason of the settlement," (Def. Resp. Br. R. 63-8) Sara Lee cites to *Chauffeurs & Helpers Local Union No. 50 v. McMartin-McAuliffe Mechanical Contractor, Inc.*, 708 F.2d 313, 316 (7th Cir. 1983) in a wholly misleading manner. The court in *Chauffeurs & Helpers* held that a voluntarily executed settlement agreement which was submitted to and approved by the National Labor Relations Board ("NLRB") prior to a full hearing on the merits of the dispute, resolved the underlying jurisdictional dispute and therefore superseded an inconsistent arbitral award. *See id.* at 315-16. The court's holding was narrow and specifically addressed a settlement prior to a Section 10(k) hearing on an alleged violation of the NLRA, 29 U.S.C. § 158(b)(4)(D). *See id.* The court found that because a Board decision pursuant to a 10(k) hearing takes precedence over an inconsistent arbitral decision, a Board-approved "adjustment" or settlement had the same effect. *See id.* Because the court's holding was confined to the relationship between an arbitrator's decision and the NLRB's subsequent decision pursuant to a 10(k) hearing, it is inapplicable to this case. Also, unlike the situation in *Chauffeurs*, where all of the parties to the settlement agreement were parties to the underlying arbitral dispute, neither the Fund nor Local 955 was a party to the settlement agreements executed with Sara Lee.

### b. The Language of the Award

Sara Lee contends that even if the Arbitrator's Award was not extinguished, nothing in the

Award creates an obligation to contribute to the Fund because the Award did not specifically mention "pension benefits." Sara Lee's position is unconvincing. The Arbitrator's Award stated, "[t]he Company is to return to the labor agreement it agreed to with Local 955. The goal is status quo ante bellum. The Union and employees are to be made whole. *This includes, but is not limited to, wages, benefits and retirement*." Def. Ex. B, at 6.

The Seventh Circuit has previously found that employer contributions to union pension funds are properly included in an employee's make whole relief. *See Auto Mechanics Local 701, Int'l Assoc. of Machinists & Aerospace Workers, AFL-CIO v. Joe Mitchell Buick, Inc.*, 930 F.2d 576, 578 (7th Cir. 1991). In *Joe Mitchell Buick*, after two of its members were fired by an employer, a labor union filed suit to enforce an arbitration award ordering the employer to make the two employees whole "for loss of earnings and benefits." *Id*. at 578. The employer argued that the arbitrator's award did not comprise an entitlement to pension benefits. *See id.* The *Joe Mitchell* court held otherwise, finding that contributions to the union's pension fund are "benefits" which the award required the employer to pay. *Id.* The court further held that pension contributions were owed to the fund for the full duration of the employees unlawful discharge period. *See id.* Here, like the award in *Joe Mitchell*, the Arbitrator's Award expressly ordered Sara Lee to make the Union and the employees whole, including wages, benefits and retirement. Therefore, based on the plain language of the Award, Sara Lee is required to pay the Fund unpaid contributions.

### c. Substantive attack on the Arbitrator's Award

Sara Lee claims that the Arbitrator's Award does not and cannot mandate pension contributions to the Fund because the former Local 955 employees never worked for Metz after the Company fired them and rehired them under a new CBA, and contributions are due under the

agreement only when an employee is on Metz's payroll and performing work under the contract. The Court has already found that the Arbitrator's Award encompasses pension fund contributions and to the extent that Sara Lee is attempting to dispute the rational of the Arbitrator's decision, it has waived reliance on this argument by not moving to vacate the Arbitrator's Award. *See e.g., Centor*, 831 F.2d at 1311; *Domas*, 778 F.2d at 1268.

### ii. Unpaid Pension Contributions Based on the Local 955 CBA and Trust Agreement

As stated above, the Fund is not only seeking to enforce the Arbitrator's Award, it also contends that the Local 955 CBA and Trust Agreement provide an independent basis for Sara Lee's contribution obligation.

### a. Sara Lee's Obligation to Contribute to the Fund under the CBA and Trust Agreement after February 14, 2001

The Fund asserts that Metz's termination of the six Local 955 employees on February 14, 2001 did not terminate its duty to contribute to the Fund under the Local 955 CBA. Sara Lee contends that Metz terminated the Local 955 CBA when it closed its distribution depot and fired the six Local 955 employees, thereby ending its contribution obligation, and that even if Metz did not terminate the Local 955 CBA, under the terms of the Agreement it had no duty to make pension contributions after February 14, 2001 because the Local 955 employees were no longer on Metz's payroll or performing work for Metz.

The documents (i.e. CBA and Trust Agreement) on which a pension fund relies must be strictly enforced. *See Levit v. Ingersoll Rand Fin Corp.*, 874 F.2d 1186, 1193 (7th Cir. 1989). This is because, as the Seventh Circuit has explained, pension funds are entitled to rely on the *writings* that establish the employer's obligations to them. *See Gerber Truck*, 870 F.2d at 1151 (pointing out that plans rely on the documents to determine the income they can expect to receive, which governs

their determination of benefits).  Therefore, defenses such as contract termination, among other things, cannot prevent a pension fund from enforcing an agreement evidenced by the writings.  *See id*. at 1153-54.

Additionally, § 515 of ERISA obligates an employer to pay to a multiemployer plan contributions that are required "under the terms of the plan or under the terms of a collectively bargained agreement." 29 U.S.C. § 1145.  The Fund may only collect delinquent contributions from Sara Lee to the extent that they are promised by an actual contract or agreement.  *See Laborers Health and Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete*, 484 U.S. 539, 548-50 (1988).  Put another way, Sara Lee is not required to make contributions on behalf of employees not indicated by the agreements. *Central States, S.E. & S.W. Areas Pension Fund v. Hartlage Truck Serv., Inc.*, 991 F.2d 1357, 1360 (7th Cir. 1993).  Therefore, the Court must look to the CBA and Trust Agreement to decide whether Sara Lee is liable for contributions on behalf of the six Local 955 former Metz employees.

When courts examine a contract in the ERISA context, they apply federal common law rules of interpretation.  *See Central States, S.E. & S.W. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 731 (7th Cir. 1996).  These federal common law rules instruct the Court to interpret the Agreement "in an ordinary and popular sense" as a person of "average intelligence and experience" would. *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir. 1992) (internal quotations omitted).  If an agreement is ambiguous, the trier of fact must resolve questions of interpretation. *See Kroger*, 73 F.3d at 732.  In the ERISA context, a contract is ambiguous if it is "susceptible to more than one reasonable interpretation." *Id*.  However, if the CBA is not ambiguous, the Court may declare its meaning as a matter of law.  *Kroger Co.*, 73 F.3d at 732.

Here, there is no ambiguity in the Local 955 CBA. The Local 955 CBA permits a party to terminate the contract; however, it requires the notice to be in writing at least sixty days prior to March 23, 2002, the expiration date provided in the CBA, or any subsequent anniversary date, and provides that in the absence of such notice the agreement is automatically extended from year to year. *See* Pl. 56.1 ¶ 20. It is undisputed that when Sara Lee fired its six Local 955 employees on February 14, 2001, it never provided the required written notice to Local 955 and therefore its termination was ineffectual. Additionally, the Court notes, and it is undisputed that there was no "opt out" clause within the Local 955 CBA allowing the Company to "opt out" their employees from the Local 955 bargaining unit and unilaterally place them in the Local 795 bargaining unit when it decided to change its corporate structure. Therefore, Sara Lee breached the Agreement when it shifted the former Metz employees to the Earthgrains depot under a new CBA.

Sara Lee asserts that even if the Local 955 CBA was still in effect when it closed its depot and fired the Local 955 employees and even if Metz breached the CBA by shifting the employees to Earthgrains under a new CBA, it is still not liable to the Fund for pension contributions.

Pursuant to the terms of the Local 955 CBA, Metz entered into a Trust Agreement with the Fund. *See* Def. 56.1 Ex. A, Art. XXII, § C. Metz's Trust Agreement with the Fund required it to make contributions as stipulated in the CBA. *See* Pl. Ex E, Trust Agreement, Art. III, § 1.[5] The Local 955 CBA required Metz to make payments on behalf of Local 955 employees that had been on Metz's payroll for more than thirty days. *See* Def. Ex. A, Art. XXII, § A.

Sara Lee asserts that once it fired the Local 955 employees and Earthgrains rehired them,

---

[5]The Trust Agreement states, " Each Employer shall remit continuing and prompt contributions to the Trust Fund as required by the applicable collective bargaining agreement to which the Employer is a party, applicable law and all rules and requirements for participation by Employers in the Fund as established and interpreted by the Trustees in accordance with their authority." Pl. Ex. E, Art. III, § 1.

they were no longer on Metz payroll or performing work for Metz and therefore pursuant to the terms of CBA no pension contributions are due for these employees. Sara Lee's position is flawed because it fails to address an important part of the Local 955 CBA, its successor clause. The CBA's successor clause states, "[t]his agreement shall be binding on the parties hereto, their heirs, executors, administrators, *successors*, assigns and trustees." Def. Ex. A, Art. XXVIII, § A. (Emphasis added).

To determine whether a company is a successor employer, the Court must focus on whether it has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 43 (1987) (approving of the approach taken by the NLRB with respect to determining whether a new company qualifies as a successor employer). This inquiry is based upon the totality of the circumstances of a given situation and requires the Court to focus on whether there is a "substantial continuity" between the enterprises. *Id.* Under this approach, the Court examines a number of factors: "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.*

Here, it is undisputed that Earthgrains acquired Metz in early 2000 and subsequently consolidated Metz's operations with its own in February 2001. As a result of this consolidation, Metz closed its distribution depot and all operations were maintained out of the Earthgrains depot. Both Metz and Earthgrains were in the business of distributing breads and baked goods and the same products were being distributed from both distribution depots to the same body of customers.

Indeed, Sara Lee concedes that it consolidated the two depots to gain an economic advantage by avoiding duplication of distribution. Furthermore, the former Metz employees were doing the same job in the same working conditions at the Earthgrains depot as they were at the Metz depot. The former Metz employees would have viewed their job situation at Earthgrains as "essentially unaltered" from their job at Metz. Therefore, based on the "substantial continuity" between Earthgrains and Metz, Earthgrains was Metz's successor employer. Because Earthgrains was Metz's successor employer, under the CBA's successor clause Earthgrains was bound by the Agreement. Because Earthgrains was bound by the Local 955 CBA, while the Local 955 employees were on Earthgrains "payroll" and performing work for Earthgrains Sara Lee was required to make pension contributions to the Fund. Therefore, contrary to Sara Lee's assertion, the plain language of the CBA mandates that it pay delinquent pension contributions to the Fund on behalf of the six former Metz employees.

Lastly, the Court notes that its finding that the former Metz employees were performing work within the jurisdiction of the Local 955 CBA while working at the Earthgrains depot is not necessary to hold Sara Lee liable to the Fund for delinquent pension contributions. As stated previously, the Company *breached* the Local 955 CBA when it transferred the Metz employees to Earthgrains under a new CBA. It is undisputed that the Local 955 CBA provided for a $65.00 weekly payment to the Fund on behalf of covered employees. Therefore, had the Company not breached the Local 955 CBA and performed under the contract it would have made payments to the Fund on each of the disputed employees. As a simple matter of contract, the Fund has been damaged by the amount of the required payments. *See Khan v. Gallitano*, 180 F.3d 829, 854 (7 th Cir. 1999) (the standard measure of damages is the expectation measure that puts the injured party in the same position as

he would have been had the contract been fully performed); *Central States Pension Fund v. Joe McClelland*, 1993 WL 191800, at *6 (N.D. Ill. 1993), *aff'd.* 23 F.3d 1256 (7th Cir. 1994). The Fund had a right under the contract to certain payments and Sara Lee failed to make them. That constitutes damages. Sara Lee can not reasonably make the argument that the Fund is not entitled to pension contributions on behalf of the former Metz employees because they did not perform work under the Local 955 CBA when the they would have *but for* Sara Lee's breach. *See Joe Mitchell Buick*, 930 F.2d at 578 (contributions were owed to pension fund for the full duration of the employees unlawful discharge period).

### III. Duration of Liability

Sara Lee asserts that if the Court finds that it had an obligation to contribute to the Fund after February 14, 2001, its obligation could not have continued beyond March 22, 2002 because the Local 955 CBA terminated on that date. However, a simple reading of the CBA reveals that in making this assertion, Sara Lee is only presenting half of the picture. The CBA states that,

> This Agreement shall remain in full force and effect from the 22nd day of March, 1998, to and including March 22, 2002, and *shall continue in full force and effect from year to year thereafter unless either party hereto shall give notice in writing sixty (60) days prior to March 23, 2002, or any subsequent anniversary date, to the other party of intention to amend, change or termination [sic] this Agreement.*

Def. Ex. A, Art. XXX, § A. A contract containing an "evergreen" clause binds an employer to subsequent CBAs until the contract is properly terminated. *See Gerber Truck*, 870 F.2d at 1156. It is undisputed that Sara Lee never served a written termination notice on Local 955 prior to March 22, 2002 and therefore the Local 955 CBA continued automatically for another year, until March 22, 2003. Sara Lee contends that despite this "evergreen" clause, its obligation to contribute to the

Fund did not continue with the duration of the Agreement because in regards to pension contributions the CBA states,

> Effective March 23, 1997, the Company will contribute sixty-five dollars ($65.00) per week for each eligible employee. The Employer will continue *this rate* for at least one year after the expiration of this Agreement, provided the Company is still doing business in Kansas City and we have an extension to the contract.

Def. Ex. A, Art. XXII, § A(1) (emphasis added). Relying on this provision, Sara Lee asserts that no pension contributions were due unless the parties executed a contract extension. (Def. Resp. Br., R at 63.) However, the plain language of this provision states that the parties "will continue [the $65.00] rate" for one year after expiration. Therefore, this provision is limiting the parties ability to negotiate a new pension benefit *rate* for one year after expiration. Furthermore, the plain language of the CBA requires the Company to continue pension contributions if there is "an extension to the contract" and the contract provides for automatic extensions unless either party provides written notice to terminate the contract. *See* Def. Ex. A, Art. XXX, § A. Therefore, under the terms of the CBA, the Agreement continued until at least March 22, 2003. *See Gerber Truck*, 870 F.2d at 1156 (holding 1979-1982 labor agreement continued until 1985 because required termination notice under collective bargaining agreement was not served until late 1984). Thus, pursuant to the Local 955 CBA, Sara Lee was required to pay the Fund delinquent pension contributions on behalf of the six former Metz employees until at least March 22, 2003, unless they ceased working for Earthgrains prior to this date.

Furthermore, the Arbitrator ordered the Company to "return to the labor agreement" unless "changed by mutual agreement." Def. Ex. B, at 5. Therefore, pursuant to the Arbitrator's Award, the Local 955 CBA remained in effect until the Company and Local 955 agreed to a mutual

modification or termination of the contract.

Therefore, Sara Lee's liability for delinquent pension contributions to the Fund on behalf of the six former Metz employees continues through the earlier of three dates: 1) the first anniversary date following a termination notice that complies with the CBA, 2) the date the former Metz employee stopped working for Earthgrains, or 3) the date, following the Arbitrator's April 17, 2002 Award, that Sara Lee and Local 955 agreed, by mutual consent, to terminate the Agreement and end Local 955's representation rights.

## IV. Damages

Under ERISA, a plaintiff that brings a delinquent contribution suit under 29 U.S.C. § 1145 is entitled to the unpaid contributions, interest, doubled interest, and fees and costs. *See* 29 U.S.C. § 1132(g)(2). As stated above, the Court finds that Sara Lee is liable to the Fund for unpaid pension contributions in the amount of $65.00 per week on behalf of each of the six former Metz Local 955 employees until the earlier of three dates: 1) the first anniversary date following a termination notice that complies with the CBA, 2) the date the former Metz employee stopped working for Earthgrains, or 3) or the date, following the Arbitrator's Award, that Sara Lee and Local 955 mutually modified the Agreement to end Local 955's representation rights.

The Fund is seeking a total of $69,187.64, exclusive of attorneys fees and costs and post-judgment interest, which consists of: $33,735.00 in unpaid contributions; $17,726.32 in interest through October 31, 2008, and $17,726.32 in doubled interest. However, the Fund bases its damages calculation on inadmissible compromise negotiations between Sara Lee and Local 955 and Sara Lee has not provided the Court with any information upon which to calculate damages. *See* Fed. R. Evid. 408. Therefore, based on the parties' current submissions the Court has insufficient

information to determine damages. The parties are ordered to file briefs on the damages issue. Any briefs filed should contain a computation of the work performed for each of the six former Metz employees from February 14, 2001 through their last day of work at Earthgrains, and should provide what date, following the Arbitrator's April 17, 2002 Award, the Local 955 CBA was terminated by notice that complied with the Agreement or was mutually modified to extinguish Local 955's representation rights. Finally, the briefs should also address the issues of penalties, interest, and any liquidated damages or attorneys fees that ERISA provides.

## CONCLUSION AND ORDER

The Court grants the Fund's Motion for Summary judgment and denies Sara Lee's cross-motion for Summary Judgment. Sara Lee is liable to the Fund for unpaid pension contributions on behalf of the six former Metz employees for the period beginning on February 14, 2001 and continuing until the earlier of three dates: 1) the first anniversary date following a termination notice that complies with the CBA, 2) the date the former Metz employee stopped working for Earthgrains, or 3) or the date, following the Arbitrator's April 17, 2002 Award, that Sara Lee and Local 955 mutually modified the Agreement to end Local 955's representation rights. The parties are to submit briefs on damages within thirty days of the Court's order.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   September 28, 2009